ABBEY SPANIER RODD & ABRAMS, LLP
Arthur N. Abbey, Esq.
Nancy Kaboolian, Esq. (NK 6346)
nkaboolian@abbeyspanier.com
212 East 39th Street
New York, New York  10016
Tel: (212) 889-3700
Fax: (212) 684-5191

Attorneys for Plaintiff



FEB 0 8 2008

U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARNOLD J. ROSS, Individually and on behalf of all others similarly situated,<br><br>                        Plaintiff<br><br>      -v-<br><br>EARL W. COLE, III, MICHAEL L. FALCONE, WILLIAM S. HARRISON, MARK K. JOSEPH, and MUNICIPAL MORTGAGE & EQUITY, LLC.,<br><br>                   Defendants. | C.A. **08 CV 1299**<br><br>CLASS ACTION COMPLAINT<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Arnold J. Ross ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included among other things, a review of the defendant's public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Municipal Mortgage & Equity, LLC ("MMA" or "MuniMae", or the "Company"), securities analysts'

reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock of MMA between January 2003 to January 28, 2008 ("Class Period"), seeking to recover damages caused by Defendants' violation of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  The Company maintains offices in this District and has also engaged in substantial financial transactions in this District.  In addition, many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Plaintiff resides in New York.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

2

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, Arnold J. Ross, as set forth in the accompanying certification, incorporated by reference herein, purchased MMA securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant MMA is a Delaware limited liability company which provides debt and equity financing to various parties, invests in tax-exempt bonds and other housing-related debt and equity investments, and is a tax credit syndicator that acquires and transfers low-income housing tax credits.  MMA maintains offices at 99 Park Avenue, Suite 2010, New York, New York 10016.

8.      Defendant Earl W. Cole, III served as Executive Vice President responsible for the corporate credit and portfolio risk management group for the Company during the Class Period.

9.      Defendant Michael L. Falcone served as a director of the Company during the Class Period, Chief Executive Officer and President of the Company since January 1, 2005 and President and Chief Operating Officer of the Company from 1997.

10.     William S. Harrison served as Executive Vice President and Chief Financial Officer for the Company from 2001 until his resignation effective as of December 31, 2005 and between 2001 and October 2003, as Corporate Secretary of the Company.

11.     Mark K. Joseph served as a director of the Company during the Class Period, Chairman of the Board of the Company since 1996 and Chief Executive Officer of the Company from 1996 to December 31, 2004.

3

12.    Defendants set forth in ¶¶9-11 are collectively referred to hereinafter as the "Individual Defendants."

13.    During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of MMA and its subsidiaries and affiliates, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

15.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the

4

above officers and directors of MMA and its subsidiaries and affiliates, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.    As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained

therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with MMA, each of the Individual Defendants had access to the adverse undisclosed information about MMA's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MMA and its business issues or adopted by the Company materially false and misleading.

18.     The Individual Defendants, because of their position of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their insurance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.     Each of the defendants is liable as a participant is a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MMA securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding MMA's business, operations, management and the intrinsic value of MMA securities; (ii) caused Plaintiff and other members of the Class to purchase MMA securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the

common stock of MMA between January 30, 2003 to January 28, 2008 (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MMA's securities were actively traded on the NYSE. According to the Company's quarterly report filed with the SEC on Form 10-Q on August 1, 2006, the Company had approximately 38,519,096 shares outstanding at June 30, 2006. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds members in the proposed Class. Members of the Class may be identified from records maintained by MMA or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

22.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of MMA; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

25.  A class action is superior to all other available methods of the fair and efficient adjudicaton of this controversy since joinder of all members of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be difficulty in the management of this action as a class action.

### Substantive Allegations

26.  Defendant MMA provides debt and equity financing to developers of multifamily housing and other types of commercial real estate. The Company invest in tax-exempt bonds, or interests in bonds, issued by state and local governments or their agencies or authorities to finance multifamily housing developments. Interest income derived from the majority of the Company's bond investments is exempt income for Federal income tax purposes.

27.  During the Class Period, defendants issued numerous statements concerning the Company's financial performance and the quality of the assets comprising its bond portfolio. Throughout this period, it has misrepresented the true value of these assets in contravention of GAAP, SEC guidance, and its own policies.

8

28. The numerous statements concerning these matters issued by the Company during the Class Period were each materially false and misleading because they failed to disclose and misrepresented the true financial condition and operations of the Company. The following adverse facts which were known to Defendants or recklessly disregarded by them are: (1) that the Company has maintained artificially inflated asset values on a significant portion of its tax-exempt bond portfolio and has not properly recognized other-than-temporary impairments in its loan portfolio; and (2) that the Company has failed to maintain adequate internal accounting controls and procedures, and has, in fact, overridden controls and procedures.

29. On February 27, 2003, the Company announced the financial results for its fourth quarter and fiscal year 2002. In the press release, entitled "MuniMae Reports 2002 Cash Available for Distribution Increases 16%; Closes Year with 24th Consecutive Increase in Distributions," the Company reported net income allocated to common shares of $28,796,000, an increase from $23,847,000 for 2001, and stated the following, in relevant part:

> Municipal Mortgage & Equity LLC (NYSE:MMA) reported today that total Cash Available for Distribution ("CAD") for the year ended December 31, 2002 increased 16% compared to 2001. CAD per common share increased 4% to $2.00 from $1.92. Basic earnings per share and diluted earnings per share for the year were $1.16 and $1.13, respectively. These compared to 2001 results of $1.12 per share for basic earnings and $1.09 per share for diluted earnings. The Board of Directors previously raised the quarterly dividend to common shares for the fourth quarter to $0.4425, the 24th consecutive increase in the quarterly distribution. For the year, MuniMae paid distributions totaling $1.755 per share, a 2% increase over 2001 total distributions of $1.715.

> MuniMae Chairman and CEO Mark K. Joseph, commenting on the results, stated, "I am pleased to report that the MuniMae has again met its major business objectives. Our 2002 CAD per common share of $2.00 just exceeded the analyst consensus of $1.99, and over the course of the year we increased our assets under management by 15% to $3.5 billion at year-end. Earlier this month we completed a $76 million common equity offering, which

will report our 2003 business plan. We remain committed to providing great service to our developer clients and investors and look forward to continuing to implement our established strategy of steady CAD growth through expanding our investment portfolio and our sources of the income."

\*    \*    \*

Fourth Quarter Distribution Results

MuniMae's fourth quarter distribution to common shareholders of $0.4425 annualizes to $1.77 per share. Based on today's closing share price of $23.49, MuniMae common shares have an annualized yield to shareholders of 7.5%. Assuming the Company's income during the year is 85% exempt from Federal income tax, and assuming a 38.6% tax bracket, the taxable equivalent yield would be 11.6%. 2002 tax information on Form K-1 will be mailed to shareholders in early March.

30.    In the same press release, the Company also provided that its "impairments and valuation allowances related to investments" were $730,000 for its fiscal year 2002, down from $3,256,000 for its fiscal year 2001.

31.    On March 27, 2003, the Company filed its annual report for its fiscal year 2002 ("2002 Annual Report") with the SEC on Form SEC 10-K. The annual report repeated and affirmed the financial results announced in the February 27, 2003, press release as well as prior quarterly periods comprising fiscal year 2002.

32.    The 2002 Annual Report provided the following with regard to the Company's management of defaulted assets:

Management of Defaulted Assets

In certain circumstances involving the Company's tax-exempt bonds, borrowers have defaulted on their debt obligations to the Company. In such circumstances the Company has, after evaluating its options, chosen not to foreclose on the property. Instead, the Company has negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of a property with, an entity affiliated with the Company. The

10

Company has done so in order to preserve the original tax exempt bond obligations and its participation in cash flow from the property, consistent with its overall goal of providing tax-exempt income to its shareholders.

33.     Included in the 10-K were certifications by defendants Harrison and Joseph

attesting to the accuracy of the financial report and the integrity of the Company's internal

controls and accounting applications. One such certification attested to the following:

1.      I have reviewed this annual report on Form 10-K of Municipal Mortgage & Equity LLC;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

    a.  Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b.  Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

    c.  Presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluations as of the Evaluation Date;

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors;

11

a. all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors may material weaknesses in internal controls; and

b. any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly report whether here were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

34.    Also included in the 10-K filed March 27, 2003, were certifications, made

pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, of defendants Harrison and Joseph

attesting to the following:

> Each of the undersigned officers of Municipal Mortgage & Equity , LLC, a Delaware limited liability company (the "Company"), hereby certifies that (i) the Company's Quarterly Report on Form 10-K for the year ended December 31, 2002 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2002 fairly presents, in all material respects, the financial condition and results of operations of the Company, at and for the periods indicated.

35.    On July 17, 2003, the Company issued a press release announcing the financial

results for its fiscal 2003 second quarter that stated, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA-News), known as MuniMae, reported net income allocated to common shares of $30.6 million for the quarter ended June 30, 2003, compared to $2.9 million for the same period in 2002. Diluted earnings per share were $1.05 for the quarter, compared to $0.11 for the same period in 2002.
>
> Cash available for Distribution ("CAD"), the primary measure of the Company's distribution paying ability, increased 18% for the

quarter ended June 30, 2003 compared to the same period in 2002. CAD per common share increased 6% compared to the same period in 2002. The Board of Directors raised the quarterly distribution to common shares to $0.4475, an increase of 2% over the same period in 2002.

36.    In the press release, defendant Joseph was attributed with the following comments regarding the Company's financial results:

We are pleased to announce the 26th consecutive increase in our dividend. We are pleased with our second quarter performance as well. MuniMae continues to diversify its product base, and as announced previously, has purchased the Housing and Community Investing (HCI) unit of Lend Lease Real Estate Investments, formerly known as Boston Financial Group. HCI is a market leader in the syndication of low-income housing tax credits and we expect their strong franchise to contribute meaningfully to our continuing efforts to increase our cash available for distribution, or CAD, and shareholder value."

During the second quarter, the Company also experienced a significant increase in GAAP earnings due to the sale of a bond. For CAD, a large portion of the income generated by the sale of the bond was offset by the Company's sale of certain interest rate swaps. However, because of a previous GAAP write-off of a portion of this bond, the GAAP net income resulting from these two transactions was significantly greater than the CAD net income.

37.    On August 13, 2003, the Company filed its quarterly report for its fiscal 2003 second quarter with the SEC on Form 10-Q. The quarterly report essentially repeated and confirmed the financial results presented in the Company's July 17, 2003 press release. The quarterly report provided additional details concerning the sources of the Company's revenues and income.

38.    The report was certified pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 by defendants Harrison and Joseph that the "information contained in the Report fairly

presents, in all material respects, the financial condition and results of operations of the Company," among other certifications.

39.    The Form 10-Q also included certifications pursuant to Section 302 of the Sarbanes Oxley Act of 2002 by defendants Harrison and Joseph that stated:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that his materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:
>
>> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.    Every quarterly and annual report filed with the SEC by the defendants during the Class Period contained similar, if not the same, certifications pursuant to the Sarbanes-Oxley Act of 2002.

41.    On March 1, 2004, the Company issued a press release entitled "MuniMae Completes $1.6 Billion in Production for 2003; Company Exceeds Prior Year Production by 16%" that provided, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, announced today that it structured approximately $1.6 billion of financing in 2003.
>
> MuniMae Chairman and CEO Mark K. Joseph, commenting on the results, stated, "I am pleased to announce 16% growth over 2002 production levels. MuniMae continues to grow as a full service provider with over $8 billion in assets under management. As a result of the acquisition of a major tax credit syndication business last July, our equity business accounted for over 30% of total production for 2003. The contributions of this new business as well as the existing products are expected to provide the revenues necessary to position the Company to take advantage of future opportunities."
>
> Investment Activity Summary
>
> Highlights of 2003 investment activity include:

| | Fourth Qtr. Volume (in millions) | Fiscal 2003 Volume (in millions) |
|---|---|---|
| | | |
| Taxable Construction/Permanent Lending | $213.3 | $602.9 |
| Tax-exempt Bonds | | |

| Construction/Permanent | 209.3 | 408.1 |
|---|---|---|
| Supplemental Loans | 15.6 | 57.9 |
| Equity Syndications/Investments | 278.4 | 515.6 |
| Total | $715.6 | $1,584.5 |

2003 production activity represents approximately 197 communities and 13,106 units located throughout the United States.

Capital Activity Summary

In the fourth quarter of 2003, the Company raised $336.0 million of tax credit equity from two new third-party investors as well as our existing partners, bringing the year-to-date total to $555.1 million in equity raised.

42.     On March 1, 2004, the Company announced financial results for its fourth quarter and fiscal year 2003 ended December 31, 2003. The press release, the headline of which lauded that the Company "Closes Year with 28[th] Consecutive Increase in Distribution," stated, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, reported net income allocated to common shares of $72.5 million for the year ended December 31, 2003, compared to $28.8 million for the same period in 2002. Diluted earnings per share were $2.44 for the year, compared to $1.13 for the same period in 2002. The substantial changes in GAAP earnings resulted primarily from a $25.7 million transaction recorded as discontinued operations and a $21.2 million decrease in losses on derivative securities.
>
> Cash Available for Distribution ("CAD") to common shares, the primary measure of the Company's distribution paying ability, increased 26% for the year ended December 31, 2003 compared to the same period in 2002. (The Company uses CAD as its primary measure of performance and believes it to be illustrative of its distribution-paying ability. CAD differs from net income because of variations between GAAP income and actual cash received. These variations are described in the note to the attached calculation of CAD statement.) CAD per common share for the year ended December 31, 2003 of $2.13 increased 6.5% compared to the same period in 2002. The Board of Directors raised the quarterly distribution of holders of our common shares to $0.4525, an increase of 2% over the same period in 2002. For the year,

16

MuniMae paid distributions totaling $1.795 per common share compared to $1.755 per common share in 2002.

*         *         *

MuniMae's fourth quarter distribution to common shareholders of $0.4525 annualizes to $1.81 per share. Based on the February 27, 2004 closing share price of $25.99, MuniMae common shares have an annualized yield to shareholders of 7.0%. Based on the assumption that the Company's income is 75% - 80% exempt from Federal income tax, absent the impact of capital gains and assuming a 35% tax bracket, the taxable equivalent yield would be 9.8% - 10.0%. The over-all tax exempt percentage for 2003 was 80% absent the impact of capital gains. Tax information for 2003 on Form K-1 was mailed to shareholders beginning in late February.

43.    On March 1, 2004, the Company announced financial results for its fourth quarter and fiscal year 2003 ended December 31, 2003. In the press release, the headline of which lauded the Company "Closes Year with 28[th] Consecutive Increase in Distributions," defendant Joseph is quoted commenting on Company's performance as follows:

I am pleased to report that MuniMae has marked 2003 as another year of growth for the Company. Year-end CAD per share exceeded analyst consensus of $2.10, while our total production rose 16% over 2002. MuniMae has successfully progressed from $230 million in total assets since listing in 1996 to over $2 billion at year-end 2003, with an 18% average annual total return to shareholders over the same period.

44.    On March 12, 2004, the Company filed its annual report for its 2003 fiscal year ended December 31, 2003 with the SEC on Form 10-K ("2003 Annual Report"). The annual report essentially repeated and reaffirmed the financial results presented in the Company's quarterly reports comprising its fiscal year 2003 and the March 1, 2004 press release. The annual report provided additional details concerning the sources of the Company's revenues and income.

45.    In the 2003 Annual Report, the section entitled "Investment in Tax-Exempt Bonds

and Residual Interest in Bond Securitizations" provides the following information purportedly

describing the method utilized the Company in determining the fair value of certain investment

interests:

> Investment in tax-exempt bonds and residual interests in bond securitizations (collectively, "investments in bonds") are accounted for under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). All investments in bonds are classified and accounted for as available-for-sale debt securities and are carried at fair value. Unrealized gains or losses arising during the period are recorded through other comprehensive income in shareholders' equity, while realized gains and losses and other-than-temporary impairments are recorded through operations. The Company evaluates on an ongoing basis the credit risk exposure associated with these assets to determine whether any other-than-temporary impairments exist in accordance with the Company's policy discussed in the Other-Than-Temporary Impairments section of this discussion. Future adverse changes in market conditions or poor operating results from the underlying real estate could result in losses or an inability to recover the carrying value of the investments.
>
> The Company determines the fair value of participating bonds (i.e., bonds that participate in the net cash flow and net capital appreciation of the underlying properties) that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The rates ranging from 8.2% to 12.0% for the year ended December 31, 2003. Increasing the discount rates by 50 basis points and the capitalization rates by 100 basis points would result in decreasing the recorded asset on the Company's balance sheet by approximately $11.1 million, with an offsetting decrease to other comprehensive income.
>
> The Company bases the fair value of non-participating bonds and residual interests in bond securitizations, which also have a limited market, on quotes from external sources, such as brokers, for these or similar bonds or investments. Net operating income is one of the key assumptions used to value the non-participating bonds and residual interests in bond securitizations. Had net operating

18

income been decreased by 10% and 20%, the fair value of the
bonds and residual interests in bond securitizations would have
decreased by approximately $2.6 million and $4.7 million,
respectively.

Because the Company's investment in tax-exempt bonds and
residual interests in bond securitizations are secured by non-
recourse mortgage loans on real estate properties, the value of the
Company's assets is subject to all of the factors affecting bond and
real estate values, including macro-economic conditions, interest
rate changes, demographics, local real estate markets and
individual property performance. Further, many of the Company's
investments are subordinated to the claims of other senior interests
and uncertainties may exist as to a borrower's ability to meet
principal and interest payments.

46.    Directly underneath the aforementioned section, the 2003 Annual Report provides

the following description of how the Company accounts for certain valuation adjustments to

certain assets:

Other Than-Temporary Impairments and Valuation Allowances.

The Company evaluates on an ongoing basis the credit risk
exposure associated with its assets to determine whether other-
than-temporary impairments exist or a valuation allowance is
needed. When the Company believes that it is probable that it will
not collect all amounts due, including principal and interest, under
the terms of an investment, it records an other-than-temporary
impairment of an investment on the present value of expected
future cash flows discounted at the investment's effective interest
rate, or the fair value of the collateral if the investment is collateral
dependent.

47.    The Company's 2003 Annual Report provides the line-item details regarding the

various impairments the Company had recognized on its various assets. This included the

following other adjustment listed as part of the annual report's "Selected Financial Data" to its

income statement data:

| (in thousands) | 2003 | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|---|
| Impairments and valuation allowances related to investments | (6,983) | (730) | (3,256) | (1,508) | (1,120) |

\*        \*        \*

Impairments and Valuation Allowances Related to Investments

> In accordance with the Company's valuation and impairment policies, the Company recorded $7.0 million in impairments and valuation allowances in 2003 related primarily to: (1) two bonds and eight taxable loans with an aggregate face amount of $39.0 million; and (2) advances to two tax credit equity funds with outstanding balances of $9.3 million. In 2002, the Company recorded $0.7 million in impairments and valuation allowances related to four bonds and one taxable loan with an aggregate face amount of $57.6 million. In 2001, the Company recorded other-than-temporary impairments of $3.3 million on two bonds with an aggregate face amount of $21.5 million.

48.    The 2003 Annual Report provided the following line item for impairment in a table reconciling the Company's GAAP net income to CAD for its fiscal years 2001 through 2003, along with the corresponding note:

| (in thousands) | 2003 | 2002 | 2001 |
|---|---|---|---|
| (5) Valuation allowances and other-than-temporary impairments | 4,134 | 730 | 3,256 |

49.    The 2003 Annual Report further discussed its other-than-temporary impairments and valuation allowances on investments as follows:

> Other-Than-Temporary Impairments and Valuation Allowances on Investments
>
> The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. When the Company believes that it is probable that it will not collect all amounts due, including principal and interest, under

the terms of an investment, it records an other-than-temporary impairment or valuation allowance. The Company bases its measure of impairment of an investment on the present value of expected future cash flows discounted at the investment's effective interest rate, or the fair value of the collateral if the investment is collateral dependent. Other-than-temporary impairments and valuation allowances are reported in Note 3 and Note 4 respectively. The Company also evaluates other receivables and advances for collectability on an ongoing basis. When the Company believes it is probable that is will not collect all amounts due, the balance is written down to its realizable value. For the years ended December 31, 2003, 2002 and 2001, the Company recorded other-than-temporary impairments on tax-exempt bonds of $3.8 million, $0.4 million and $3.3 million, respectively. For the years ended December 31, 2003 and 2002, the Company recorded an allowance for loan losses of $0.6 million and $0.3 million, respectively. No allowance for loan losses were recorded in 2001. For the year ended December 31, 2003, the Company recorded an allowance of $2.5 million for other receivables and advances. No allowance for other receivables and advances was recorded during 2002 or 2001.

50.    The 2003 Annual Report provides the following discussion of investments with

unrealized losses:

The following table shows unrealized losses and fair value aggregated by length of time that the tax exempt bonds have been in a continuous loss position at December 31, 2003.

(in thousands)

| Less than 12 Months | | 12 months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized losses |
| $200,034 | $(12,793) | $133,428 | ($21,210) | $333,462 | $(34,003) |

At December 31, 2003, there were 22 tax-exempt bonds in a continuous unrealized loss position for more than twelve months, and 26 tax-exempt bonds in a continuous unrealized loss position for less than twelve months. As discussed in Note 1, the fair value of tax-exempt bonds is determined by external quotes or a discounted cash flow analysis. Both methodologies are based on current market conditions including occupancy and net operating income of the underlying properties. An other-than-temporary impairment is only recorded when the Company believes it is possible that it will not collect all amounts due under the terms of the tax-exempt bond. The Company expects to receive payments

21

in excess of its investment over the life of the bonds in the above table. These bonds are not considered to be other-than-temporary impaired at December 31, 2003.

Other-than-Temporary Impairments

In 2003, the Company recorded other-than-temporary impairments totaling $3.8 million on two bonds. In 2002, the Company recorded other-than-temporary impairments totaling $0.4 on four bonds.

In 2001, the Company assumed the obligation to purchase two bonds for their face amount ($21.5 million). In consideration for assuming this obligation, the Company received $1.9 million in cash and a $2.0 million (face amount) taxable note with a fair value of $1.4 million. The Company recognized a $3.3 million other-than-temporary impairment upon the assumption of this obligation. This amount represented the difference between the fair value of the bonds and the face amount of the bonds at the time the Company assumed the purchase obligation. Upon the purchase of the bonds, the Company recognized $3.3 million in income that represented the value of the cash and taxable loan consideration received.

Investments on Non-Accrual Status

In accordance with the Company's policy discussed in Note 1, the Company places delinquent bonds on non-accrual status for financial reporting purposes when collection of interest is in doubt, which is generally after 90 days of non-payment. At December 31, 2003, 2002, and 2001, there were $102.8 million, $102.9 million and $71.7 million (face value), respectively, of tax-exempt bonds on non-accrual status. Interest income recognized on these bonds was $5.0 million, $7.7 million and $4.9 million for the years ended December 31, 2003, 2002 and 2001, respectively. Additional interest income that would have been recognized by the Company had these bonds not been placed on non-accrual status was approximately $2.4 million, $1.0 million and $1.2 million for the years ended December 31, 2003, 2002 and 2001, respectively.

Tax Exempt Bonds Pledged

In order to facilitate the securitization of certain assets at higher leverage ratios than otherwise available to the Company without the posting of additional collateral, the Company has pledged additional bonds to various pools that act as collateral for senior interests in certain securitization trusts. From time to time, the Company also pledges bonds as collateral for letters of credit, lines of credit, warehouse lending arrangements, CAPREIT investments

and other derivative agreements. At December 31, 2003 and 2002, the total carrying amount of the tax-exempt bonds pledged as collateral was $452.3 million and $372.9 million respectively.

51.    In summary, the Company took impairments and valuation allowances of $6.983 million in 2003, $730,000 in 2002, and $3.256 million in 2001.  The 2003 Annual Report itemized by business segment the impairments and valuation allowances related to investments for the Company's fiscal year 2003, 2002, and 2001 as follows:

(in thousands)

| | Investing | Operating | 2003 Adj. | Total Consolidated | Investing | Operating | 2002 Adj. | Total Consolidated |
|---|---|---|---|---|---|---|---|---|
| Impairment and valuation allowances related to investments | (4,198) | (2,785) | -- | (6,983) | (730) | -- | -- | (730) |
| | -- | (3,256) | 2001 -- | (3,256) | | | | |

52.    The 2003 Annual Report also provides a summary of quarterly results which includes the impairment amounts for each quarter.  The Company's impairments charged for its Fiscal Year 2003 included $1.144 million in the second quarter and $5.839 million for the fourth quarter.  During its Fiscal Year 2002, the Company took impairment charges for the first quarter of $110,000 and $620,000 for the fourth quarter.

53.    The 2003 Annual Report provided the following with regard to the Company's management of defaulted assets:

> Affiliate Management and Control of Defaulted Assets
>
> From time to time, borrowers have defaulted on their debt obligations to the Company.  Some of these obligations were incurred in connection with the development of properties that collateralize the Company's tax-exempt bonds.  These properties are sometimes referred to as "defaulted assets."  In a number of these circumstances the Company has, after evaluating its options, chosen not to foreclose on the property.  Instead, the Company has

23

negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of an original borrowing partnership with, an equity controlled by and affiliated with certain officers of the Company. Following the transfer of a property to, or the replacement of the general partner with, an affiliated entity, the entity controls the defaulted asset, which serves as collateral for the debt to the Company. The Company refer to all transferees as "affiliated entities" for purposes of this discussion. These affiliated entities include partnerships in which Mr. Joseph has an interest and 501 (c) (3) corporations that have Board members and officers who are also executive officers of the Company. These officers acting as Board members and officers of the affiliated entities do not have personal financial interest in the entities. Only Mr. Joseph has a personal financial interest in these partnerships, as described above in the section entitled "Related Party Transactions." The Company has taken this action to preserve the value of the original tax-exempt bond obligations and to maximize cash flow from the defaulted assets. This result is consistent with the Company's goal of providing tax-exempt income to its shareholders. The following table outlines these affiliate relationships at December 31, 2003:

(in thousands)

| | Number of Properties Owned (directly or indirectly) | Carrying Value of Company's Investment at December 31, 2003 |
|---|---|---|
| Affiliate Equity | | |
| SCA Successor, Inc. (1) | 3 | $46,253 |
| SCA Successor II, Inc. (1) | 12 | 60,331 |
| MMA Affordable Housing Corp. (2) | 2 | 44,727 |
| MuniMae Foundation, Inc. (3)MMA Successor I, Inc. (1) | 2 | 11,022 |
| Total | 19 | $162,333 |

(1) These corporations are general partners of the operating partnerships whose property collateralizes the Company's investments. All of these general partner investments are 1% interests in the related operating partnerships. See above for a discussion of Mr. Joseph's interest in these general partners.

(2) MMA Affordable Housing Corporation ("MMAHC") is a 501(c)(3) non-profit entity organized to provide affordable housing. No part of its earnings inures to the benefit of any individual or

24

for-profit entity. Executive officers of the Company serve as directors of MMAHC.

(3)    MuniMae Foundation, Inc. is a private non-profit entity organized to facilitate non-profit parts of the Company's business. No part of its earnings inures to the benefit of any individual or for-profit entity. Executive officers of the Company serve as directors of the Foundation.

The affiliated entities that own and operate the defaulted assets could have interests that do not fully coincide with, or could even be adverse to, the interests of the Company's tax-exempt bond business. If any of these entities chose to act solely in accordance with their ownership interest in the defaulted assets, such as selling a property or filing a bankruptcy, the interests of the tax-exempt bondholders could be adversely impacted. In making decisions relating to the defaulted assets, the Company, by direction to its affiliates and officers, has, consistent with its overall strategy of providing largely tax-exempt income to its shareholders, elected to manage the defaulted assets in such a manner as to preserve to the greatest extent possible, the tax-exempt interest income that flows from the projects. The Company could, therefore, make a decision to defer the capital needs of a defaulted asset in favor of paying the debt service, which could adversely impact the value of the Company's collateral.

As part of the sale of certain taxable notes in 1998 and 1999, the Company provided a guarantee on behalf of the operating partnerships that hold these defaulted assets for the full and punctual payment of interest and principal due under the taxable notes. The Company's obligation under this guarantee is included in the summary of the Company's guarantees in Note 14.

54.    In addition to the affirmations of accuracy and internal controls made by defendants Harrison and Joseph, and submitted with the 2003 Form 10-K filing, pursuant to the Sarbanes-Oxley Act of 2002, Item 9A of the 2003 Form 10-K provided the additional affirmation concerning the Company's internal controls and procedures:

Under the direction of the Company's Chief Executive Officer and Chief Financial Officer, management evaluated its disclosure controls and procedures and internal control over financial reporting and concluded that (i) its disclosure controls and procedures were effective as of December 31, 2003 and (ii) no change in internal control over financial reporting occurred during the quarter ended December 31, 2003 that has materially affected,

25

or is reasonably likely to materially affect, such internal control over financial reporting.

55.    On March 2, 2004, the Company issued a press release announcing a "follow-on offering of its common stock" that stated in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, announced today that it entered into an agreement to sell 1,950,000 common shares to RBC Capital Markets and Legg Mason Wood Walker, Inc. In addition, the Company granted the underwriters the option to purchase an additional 195,000 shares to cover any over allotments.

> MuniMae expects to use the net proceeds from this offering to fund future investment opportunities, to reduce outstanding indebtedness and for general corporate purposes.

56.    On September 23, 2004, the Company issued a press release announcing a revision to its 2004 interim financial statements due to the Company's failure to account for deferred compensation expenses. The press release stated, in relevant part:

> Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, today announced revisions to its previously reported results for the three months ended March 31, 2004 and six months ended June 30, 2004 to reflect the GAAP effect of $3.0 million in deferred compensation expense which had not previously been recorded. The impact of the revisions on the Company's net income and earnings per share are as follows:

| Three Months ended March 31, 2004 | Previously Reported | Revised |
|---|---|---|
| Net Income (loss) ($millions) | $1.2 | ($1.3) |
| Earnings per share, Basic | $0.04 | ($0.04) |
| Earnings per share, Diluted | $0.04 | ($0.04) |
| | | |
| Six Months ended June 30, 2004 | | |
| Net Income ($millions) | $12.4 | $9.9 |
| Earnings per share, basic | $0.37 | $0.29 |
| Earnings per share, diluted | $0.37 | $0.29 |

Since the payments to which this expense relates will be spread over three years beginning in July 2005, the expenses do not affect the Company's cash flow for either period.

Description of Restatement

As previously disclosed as part of the Company's Annual Report on Form 10-K for 2003, during the first quarter of 2004, following review and approval by the Compensation Committee of the Board of Directors, the Company entered into a number of employment agreements with senior executives. One of these agreements provided for deferred compensation payments, totaling $3.0 million and payable ratably over 36 months beginning in July 2005, to the Company's Chairman and Chief Executive Officer, who is expected to retire as Chief Executive Officer on June 30, 2005. Based on the terms of his employment agreement, the discounted value ($2.5 million for the three-month period ended March 31, 2004 and $2.6 million for the six-month period ended June 30, 2004) of these payments is reflected as compensation expense for those periods. The failure to timely record this expense was an oversight due to inadequate internal communications at the time the contract was executed.

In connection with its ongoing internal controls initiatives relating to the Sarbanes-Oxley Act of 2002, management of the Company is revising and enhancing its controls relating to the approval of material contracts in order to prevent similar errors in the future.

57.    On October 27, 2004, the Company issued a press release entitled "MuniMae

Announces Investment Grade Rating of Subsidiary" which stated, in relevant part:

Municipal Mortgage & Equity, LLC (NYSE:MMA), known as MuniMae, today announced that Moody's Investors Services, Inc. has assigned an A2 Issuer Rating to MuniMae TE Bond Subsidiary, LLC. In addition, Moody's assigned ratings to each series of preferred shares issued by MuniMae TE Bond Subsidiary. This is the first investment grade rating obtained by MuniMae for one of its subsidiary companies and for the tax-exempt preferred shares.

The tax-exempt preferred share ratings are as follows:

| Rating | Preferred Shares |
| --- | --- |
| A3 | $120 million Series A, A-1, A-2 |
| Baa1 | $82 million Series B, B-1, B-2 (subordinate |
| Baa2 | $39 million Series C, C-1, C-2 (subordinate) |

27

The Moody's report published on September 22, 2004 stated, "The ratings reflect MuniMae TE Bond Subsidiary's strong financial condition as reflected in their strong coverage and conservative leverage ratios; satisfactory portfolio composition and performance; and sophisticated real estate management."

The investment grade rating will improve MuniMae's ability to have one of its subsidiary companies sell preferred equity as investors prohibited from investing in unrated securities can now invest in MuniMae TE Bond Subsidiary. MuniMae Chairman and CEO Mark K. Joseph, commenting on the ratings, stated, "This is a strong testament to what we have collectively built up over the past several years. The ratings affirm that our investment and management decisions have created value for MuniMae's investors." Mr. Joseph added, "The reduced financing cost of rated preferred shares relative to the cost of comparable unrated shares benefits both the preferred shareholders of TE Bond Subsidiary and the common shareholders of MuniMae."

58.    On November 10, 2004, the Company announced the financial results for its fiscal 2004 third quarter ended September 30, 2004. For the quarter, the Company reported net income of $11.6 million, or $0.33 per share, compared to $18.1 million, or $0.62 per share, for the same period in 2003.    In the press release announcing the results defendant Joseph stated:

MuniMae is pleased to continue its long history of steady growth in cash generated by our businesses. The Company has recently declared its 31st consecutive increase in its distribution to common shareholders. Despite higher regulatory and compliance costs, particularly those related to the Sarbanes-Oxley Act of 2002 our management team continues to deliver strong results.

59.    On November 9, 2004, the Company filed its quarterly report for its fiscal 2004 third quarter with the SEC on Form 10-Q. The quarterly report essentially repeated and confirmed the financial results presented in the Company's November 10, 2004 press release. The quarterly report provided additional details concerning the sources of the Company's revenues and income.

60.    On March 16, 2005, the Company issued a press release announcing it 2004 financial results. The press release reported:

By capitalizing on the synergies between our tax credit business and our tax-exempt and taxable lending businesses, we successfully structured over $2.5 billion in multifamily and other real estate investments, which is a 68% increase over 2003 production," commented Michael Falcone, Chief Executive Officer of MuniMae. He added, "As a result, our Cash Available for Distribution ("CAD") per common share grew 9% over 2003, representing our 8th consecutive year of CAD per share growth."

GAAP Results of Operations

As previously reported, the Company adopted FASB Interpretation No. 46R, "Consolidation of Variable Interest Entities" effective March 31, 2004, which required us to consolidate certain tax credit equity funds in which we have a 1% or less general partnership interest. As a result of consolidating these funds, syndication and certain other fees earned on these funds have been eliminated. These changes, coupled with financing accounting required for guaranteed tax credit equity funds, make the year over year comparisons difficult. Accordingly, we have presented adjusted amounts in an effort to improve comparability as between 2004 and 2003. These amounts are not in accordance with generally accepted accounting principles. It should be noted that, due to other significant changes in the Company's business and other new accounting principles, even these adjusted figures are not fully comparable.

For the three and twelve months ended December 31, 2004, MuniMae earned net income of approximately $5.6 million and $27.0 million, respectively, down from $9.3 million and $72.5 million for the three and twelve months ended December 31, 2003, respectively. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, MuniMae earned net income of $21.8 million and $61.1 million for the three and twelve months ended December 31, 2004, respectively, representing an increase of approximately 55% over similarly adjusted GAAP net income for the three months ended December 31, 2003 and a decrease of 17% for the twelve months ended December 31, 2003.

On a diluted per share basis, net income was $0.16 and $0.78 for the three and twelve months ended December 31, 2004, respectively, down from $0.28 and $2.44 for the three months and twelve months ended December 31, 2003, respectively. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, diluted net income per common share was $0.62 and $1.76 for the three months and twelve months ended December 21, 2004, respectively, which represents an increase of 44% from the similarly adjusted $0.43 per share for the three months ended December 31, 2003 and a 29% decrease from the $2.47 per share for the twelve months ended December 31, 2003.

MuniMae's net income results reflect gains of $11.1 million and $25.7 million from property dispositions accounted for as discontinued operations in 2004 and 2003, respectively. Adjusted to exclude the impact of these property dispositions, the consolidation of certain tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, net income was $21.6 million and $50.0 million for the three and twelve months ended December 31, 2004, respectively, which represents increases of approximately 53% and 5% as compared to adjusted net income of approximately $14.1 million and $47.9 million for the three months and twelve months ended December 31, 2003, respectively. These gains were derived from dispositions of underperforming assets that MuniMae was able to sell at attractive valuations due to favorable real estate market conditions. The proceeds from the sales allowed us to recapture all our invested capital, recoup back interest payments, realize gains on both properties, and improve the credit quality of our portfolio.

CAD Results of Operations

For the three and twelve months ended December 31, 2004, MuniMae's CAD, a performance measure, was $22.2 million and $81.7 million, respectively. MuniMae's 2004 CAD results represent increases of approximately 17% and 28%, as compared with $19.0 million and $63.8 million for the three and twelve months ended December 31, 2003, respectively. On a per share basis, CAD was $0.63 and $2.33 for the three and twelve months ended December 31, 2004, respectively, representing increases of approximately 9% as compared to $0.58 and $2.13 for the three and twelve months ended December 31, 2003, respectively.

MuniMae's fourth quarter distribution to common shareholders of $0.4725 annualized to $1.89 per share, a 4.4% increase over the annualized dividend for the fourth quarter of 2003. Based on the March 15, 2005 closing share price of $24.55, MuniMae common shares have an annualized yield to shareholders of 7.7%. Based on the assumption that the company's net income is 75% to 80% exempt from Federal income tax, absent the impact of capital gains (which impact shareholders differently depending on when they purchased their shares), the taxable-equivalent yield would be 10.8% to 11.1%(1).

Based upon the dividends paid in 2004, MuniMae has a CAD payout ratio of 80%, down from 86% in 2003. Driving down this ratio provides additional security for distributions to common shareholders and allows the Company to finance more of its growth through internally generated funds.

61.    On March 16, 2005, the Company filed its annual report for its 2004 fiscal year ended December 31, 2004 with the SEC on Form 10-K ("2004 Annual Report"). The annual report essentially repeated and reaffirmed the financial results presented in the Company's quarterly reports comprising its fiscal year 2004 and the March 16, 2005 press release. The annual report provided additional details concerning the sources of the Company's revenues and income.

62.    In the 2004 Annual Report, the section entitled "Investment in Tax-Exempt Bonds and Interests in Bond Securitizations" provides the following information purportedly describing the method utilized the Company in determining the fair value of certain investment interests:

> Investments in tax-exempt bonds and interests in bond securitizations (collectively, "investments in bonds") are accounted for under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). All investments in bonds are classified and accounted for as available-for-sale debt securities and are carried at fair value. Unrealized gains or losses arising during the period are recorded through operations. The Company evaluates on an ongoing basis the credit risk exposure associated with these assets to determine whether any other-than-temporary impairments exist in accordance with the Company's policy discussed in the Other-Than-Temporary Impairments on Bonds section of this discussion. Future adverse changes in market conditions or poor operating results from the underlying real estate could result in loses or an inability to recover the carrying value of the investments.
>
> The Company bases the fair value of non-participating (i.e., bonds that do not participate in the net cash flow and net capital appreciation of the underlying properties) and interests in bond securitizations, which also have a limited market, on quotes from external sources, such as brokers, for these or similar bonds or investments. Net operating income is one of the key assumptions used to value the non-participating bonds and interests in bond securitizations. Had net operating income been decreased by 10% and 20%, the fair value of the bonds and interests in bond securitizations would have decreased by approximately $35.7 million and $69.2 million, respectively.

31

The Company determines the fair value of participating bonds that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The Company selected discount rates ranging from 10.1% to 12.9% and capitalization rates ranging from 7.8% to 10.75% for the year ended December 31, 2004. Increasing the discount rates by 50 basis points and the capitalization rates by 100 basis points would result in decreasing the recorded asset on the Company's balance sheet by approximately $12.6 million, with an offsetting decrease to other comprehensive income.

Because the Company's investment in tax-exempt bonds and interest in bond securitizations are secured by non-recourse mortgage loans on real estate properties, the value of the Company's assets is subject to all of the factors affecting bond and real estate values, including macro-economic conditions, interest rate changes, demographics, local real estate markets and individual property performance. Further, many of the Company's investments are subordinated to the claims of other senior interests and uncertainties may exist as to a borrower's ability to meet principal and interest payments.

63.    The 2004 Annual Report further discussed its other-than-temporary impairments and valuation allowances on investments as follows:

The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar characteristics or discounted cash *flow* valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost, and after assessing the above-mentioned factors it is determined that an other-than-temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is

adjusted accordingly, Other-than-temporary impairments and valuation allowances are reported in Note 3 and Note 4, respectively. The Company measures impairment of a loan in accordance with the provisions of FAS 114, FAS 114 requires a creditor to base its measure of loan impairment on the present value of expected future cash *flows* discounted at the loan's effective interest rate or the fair value of the collateral if the loan is collateral dependent. The Company provides an allowance for loan losses based upon management's evaluation of all loans in the portfolio. In management's judgment, consideration has been given to overall loss experience, loan-to-value ratios, delinquency data, economic market conditions, debt service coverage, indemnification agreements, and other factors that warrant recognition in reviewing the portfolio for impairment. The Company also evaluates other receivables and advances for collectibility on an ongoing basis. When the Company believes it is probable that it will not collect all amounts due,

the balance is written down to its realizable value. For the years ended December 31, 2004, 2003 and 2002, the Company recorded other-than-temporary impairments on tax-exempt bonds of $4.2 million, $3.8 million and $0.4 million, respectively. For the years ended December 31, 2004, 2003 and 2002, the Company recorded allowances for loan losses of $1.3 million, $0.6 million and $0.3 million, respectively. For the year ended December 31, 2003, the Company recorded an allowance of $2.5 million for other receivables and advances. No allowance for other receivables and advances was recorded during 2004 or 2002.

Long-Lived Assets

The Company evaluates its long-lived assets for possible impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. If the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the long-lived asset is less than the carrying amount at the date of the evaluation, an impairment loss is recognized. The impairment loss is measured as the amount by which the carrying amount exceeds the fair value of the long-lived asset. During the fourth quarter of 2004, it was determined that long-lived assets of certain Project Partnerships were impaired. As a result, the Company recorded an impairment of $1.5 million for the year ended December 31, 2004. The Company recorded no such impairment losses during the years ended December 31, 2003 and 2002.

64.    The 2004 Annual Report provides the following discussion of investments

with unrealized losses:

Investments with Unrealized Losses

The following table shows unrealized losses and fair value aggregated by length of time that the tax-exempt bonds or interests in bond securitizations have been in a continuous loss position at December 31, 2004 and 2003.

December 31, 2004
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $210,880 | $(12,862) | $293,147 | ($45,547) | $504,027 | $(58,409) |

December 31, 2003
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $206,947 | $(13,820) | $203,352 | ($39,757) | $410,299 | $(53,577) |

There were 37 and 29 tax-exempt bonds or interests in bond securitizations in a continuous unrealized loss position for more than twelve months, and 25 and 28 tax-exempt bonds or interests in bond securitizations in a continuous unrealized loss position for less than twelve months at December 31, 2004 and 2003, respectively. As discussed in Note 1, the fair value of tax-exempt bonds or interests in bond securitizations is determined by external quotes or a discounted cash flow analysis. Both methodologies are based on current market conditions including occupancy and net operating income of the underlying properties. An other-than-temporary impairment is only recorded when the Company believes it is possible that it will not collect all amounts due under the terms of the tax-exempt bond or interests in bond securitizations. The Company expects to receive payments in excess of its investment over the life of the bonds or interests in bond securitizations in the above table. These bonds or interests in bond securitizations are not considered to be other-than-temporarily impaired at December 31, 2004.

Included in the table above there are twelve and nine tax-exempt bonds as of December 31, 2004 and 2003, respectively, with other-than-temporary impairment charges in the past.

Other-than-Temporary Impairments

In 2004, the Company recorded other-than-temporary impairments totaling $4.2 million on five bonds. In 2003, the Company

recorded other-than-temporary impairments totaling $3.8 million on two bonds.

Investments on Non-Accrual Status

In accordance with the Company's policy discussed in Note 1, the Company places delinquent bonds on non-accrual status for financial reporting purposes when collection of interest is in doubt, which is generally after 90 days of non-payment. At December 31, 2004, 2003 and 2002, there were $108.1 million, $102.8 million and $102.9 million (face value), respectively, of tax-exempt bonds on non-accrual status. Interest income recognized on these bonds was $5.4 million, $5.0 million and $7.7 million for the years ended December 31, 2004, 2003 and 2002, respectively. Additional interest income that would have been recognized by the Company had these bonds been on accrual status was approximately $3.2 million, $2.4 million and $1.0 million for the years ended December 31, 2004, 2003 and 2002, respectively.

Tax-Exempt Bonds Pledged

In order to facilitate the securitization of certain assets at higher leverage ratios than otherwise available to the Company without the posting of additional collateral, the Company has pledged additional bonds to various pools that act as collateral for senior interests in certain securitization trusts. From time to time, the Company pledges bonds as collateral for letters of credit, lines of credit, warehouse lending arrangements, CAPREIT investments and other derivative agreements. In addition, at times the Company pledges collateral when providing a guarantee in connection with the syndication of tax credit equity funds. At December 31, 2004 and 2003, the total carrying amount of the tax-exempt bonds pledged as collateral was $537.0 million and $452.3 million, respectively.

65.    In summary, the Company took impairments and valuation allowances of $7.141 in 2004, $6.983 million in 2003, $730,000 in 2002, and $3.256 million in 2001.

66.    The 2004 Annual Report also provides a summary of quarterly results which includes the impairments recorded for each quarter. The Company's impairments charged for its Fiscal Year 2004 included $300,000 in the first quarter, $430,000 in the second quarter, $2.646 million in the third quarter and $3.765 million in the fourth quarter. The Company's impairments charged for its Fiscal Year 2003 included $1.144 million in the second quarter and $5.839

35

million for the fourth quarter. During its Fiscal Year 2002, the Company took impairment charges for the first quarter of $110,000 and $620,000 for the fourth quarter.

67.     The 2004 Annual Report provided the following with regard to the Company's management of defaulted assets:

> Affiliate and Non-Profit Management and Control of Defaulted Assets
>
> From time to time, borrowers have defaulted on their debt obligations to the Company. Some of these obligations were incurred in connection with the development of properties that collateralize the Company's tax-exempt bonds. These properties are sometimes referred to as "defaulted assets." In a number of these circumstances the Company has, after evaluating its options, chosen not to foreclose on the property. Instead and in lieu of foreclosure, the Company has negotiated the transfer of a property's deed in lieu of foreclosure to, or replaced the general partner of an original borrowing partnership with, an entity controlled by and affiliated with certain officers of the Company. The Company has taken this action to preserve the value of the original tax-exempt bond obligations and to maximize cash flow from the defaulted assets. Following the transfer of a property to, or the replacement of the general partner with, an affiliated entity, that entity controls the defaulted or previously defaulted asset, which serves as collateral for the debt to the Company. The Company will refer to all transferees as "affiliated entities" for purposes of this discussion. These affiliated entities include partnerships in which Mr. Joseph has interests, for purposes of this discussion, affiliate entities also include a 501(c)(3) corporation and a non-501(c)(3) corporation that have Board members and officers who are also executive officers of the Company. These officers acting as Board members and officers of the affiliated entities do not have a personal financial interest in the entities. Only Mr. Joseph has a personal financial interest in these partnerships, as described above in the section entitled "Related Party Transactions." A portion of the defaulted assets subsequently ceased to be in default. This result is consistent with the Company's goal of providing tax-exempt income to its shareholders.

68.     In addition to the affirmations of accuracy and internal controls made by defendants Harrison and Joseph, and submitted with the 2004 Form 10-K filing, pursuant to

the Sarbanes-Oxley Act of 2002, the 2004 Annual Report provided the additional affirmations concerning the Company's internal controls and procedures:

(a) Evaluation of Disclosure Controls and Procedures

The Company, under the supervision and with the participation of its management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting material information relating to the Company and the Company's consolidated subsidiaries required to be disclosed in the Company's reports filed or submitted under the Exchange Act. The Company has investments in certain unconsolidated entities. As the Company does not control these entities, its disclosure controls and procedures with respect to such entities are necessarily substantially more limited than those it maintains with respect to its consolidated subsidiaries. Notwithstanding these limitations, the Company's controls and procedures are not limited insofar as they relate to: the recording of amounts related to such investments that are recorded in our consolidated financial statements; the selection of accounting methods for the same; the recognition of equity method earnings and losses; and the determination, valuation and recording of our investment account balances therefor. As discussed in this report, the Company began consolidating the financial results of certain tax credit equity funds effective March 31, 2004 pursuant to the requirements of FIN 46R, Because the operations of these tax credit equity funds are primarily driven by underlying entities that the tax credit equity funds do not control or consolidate, and the results of these unconsolidated entities are often reported to the tax credit equity funds on a delayed basis, these entities are among the entities with respect to whose information the Company's disclosure controls and procedures are necessarily more limited than those for consolidated subsidiaries the Company controls. See "Management's Discussion and Analysis of Results of Operations and Financial Condition - Now Accounting Pronouncements" for more information regarding the consolidation of the financial results of these tax credit equity funds.

(b) Management's Report on Internal Control over Financial Reporting Management is responsible for establishing and

maintaining adequate internal control over financial reporting as defined in Rule 13a-15(t) under the Exchange Act.

Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2004 based on the criteria related to internal control over financial reporting described in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on the Company's evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2004.

The Company's management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

(c) Changes in Internal Controls Over Financial Reporting

In October 2004, in connection with its ongoing internal controls initiatives relating to the Sarbanes-Oxley Act of 2002, management of the Company implemented procedures to enhance its controls relating to the approval of material contracts. Except as disclosed above, during the fiscal quarter ended December 31, 2004, there have been no changes in the Company's internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

69.    On April 7, 2005, the Company issued a press release entitled "MuniMae

Chairman Adopts Rule 10b5-1 Trading Plan" that stated, in relevant part:

MuniMae (the "Company") (NYSE:MMA) today announced that Mark K. Joseph, Chairman of the Board, has adopted a trading plan pursuant to Rule 10b5-1 under the Securities Exchange Act of 1934.

Rule 10b5-1 allows officers and directors to adopt written, pre-arranged stock trading plans at a time when they are not in possession of material nonpublic information. Using these plans, insiders can gradually diversify their investment portfolios and reduce market impact by spreading stock trades out over an extended period of time, while avoiding concern about whether

they were in possession of material nonpublic information when the stock was sold.

Mr. Joseph's trading plan, which was effective as of March 21, 2005, provides for the sale of up to 179,815 shares of MuniMae stock that will be issued as a result of options previously awarded. The plan will allow up to 45,000 shares of stock to be sold per quarter from the plan effective date through February 24, 2007, and sales will be subject to certain price restrictions and other contingencies. In connection with the plan, Mr, Joseph commented, "I am adopting this plan as part of my overall estate planning and to ensure that I will be able to realize the value of options prior to their expiration. I remain confident in MuniMae's prospects and continue to hold a substantial stake in the Company."

As of February 2005, Mr. Joseph beneficially owned 1,236,439 MuniMae common shares, including 179,815 vested options to acquire common shares.

70.    On November 7, 2005, the Company issued a press release announcing the

financial results for its fiscal 2005 third quarter ended September 30, 2005, that stated, in

relevant part:

MuniMae (the "Company") (NYSE:MMA), a leading publicly traded real estate finance and investment management company, today announced financial results for the third fiscal quarter of 2005.

The Company reported diluted earnings per share of $0.52 and $1.21 for the three and nine months ended September 30, 2005, representing an increase of 58% and 95%, respectively, over diluted earnings per share for the comparable periods in 2004. In addition, the Company reported Cash Available for Distribution, or CAD, of $0.76 and $1.73 per share for the three and nine months ended September 30, 2005, representing increases of 6% and 2%, respectively, over CAD per share for the comparable periods in 2004.

The distribution of $0.4875 per common share, payable on November 11, 2005, to shareholders of record as of October 31, 2005, marked a record 35th consecutive increase in the Company's quarterly distribution and represents an 8% annualized yield based on the $24.22 per share closing price on November 7, 2005.

*        *        *

For the three months ended September 30, 2005, net income was $20.4 million, representing a 77% increase over net income for the same period in 2004. Adjusted to exclude the impact of consolidated tax credit equity funds and real estate operating partnerships as a result of the application of FIN 46R and the financing method of accounting related to guaranteed tax credit equity funds due to FAS 66, net income was $23.9 million for the three months ended September 30, 2005, representing a 52% increase over similarly adjusted net income for the same period in 2004.

Diluted earnings per share totaled $0.52 for the three months ended September 30, 2005, representing a 58% increase over diluted earnings per share for the same period in 2004. Adjusted to exclude the impact of consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, diluted earnings per share was $0.62 for the three months ended September 30, 2005, representing a 38% increase over the similarly adjusted earnings per share for the same period in 2004.

71.    In the press release, defendant Falcone is quoted as commenting on the financial performance as follows:

Although our tax-exempt bond originations in 2005 have fallen significantly below 2004 levels, production volumes remain strong in our other lines of business, and the continued low interest rate environment has enabled us to sell selected investments at very attractive cap rates. We remain confident in our outlook for the rest of the year, and based on our current pipeline, we expect CAD per share for the fiscal year 2005 to be at least $2.43.

72.    On November 9, 2005, the Company filed its quarterly report for its fiscal 2005 third quarter with the SEC on Form 10-Q. The quarterly report essentially repeated and confirmed the financial results presented in the Company's November 7, 2005 press release. The quarterly report provided additional details concerning the sources of the Company's revenues and income.

73.    On January 20, 2006, the Company issued a press release with the headline lauding the "36th Consecutive Increase in Quarterly Distribution" that announced a quarterly distribution of $0.4925 per common share and provided that this was an increase of 4.2%

over the comparable distribution a year prior and amounted to an annualized 7.3% yield without giving effect to any tax savings realizable to investors due to the nature of the source of the distribution. In the press release, defendant Falcone made the following comment concerning the Company's financial performance for 2005:

> Financial performance was very strong in 2005, and we are pleased to again increase the distribution to our common shareholders. During the year, production was more than $1 billion ahead of 2004 as a result of acquisitions and organic growth. We also raised approximately $1.3 billion in tax credit equity, a record for the Company and an increase of 18% over the prior year. We are optimistic about our growth prospects for 2006.

74.    In the same January 20, 2006 press release, the Company also announced a "reorganization of its operations designed to improve profitability and enhance shareholder value in 2006 and beyond." The press release described the reorganization as follows:

> The Company also recently completed a reorganization effort designed to simplify its structure, better serve its clients and position it to offer additional services and investment opportunities. MuniMae now has two major business groups: affordable housing, and real estate finance and investment management. Executive Vice President Gary A. Mentesana will lead the affordable housing group which combines the tax credit equity and tax exempt and taxable lending businesses. The combination of these functions will enable the Company to better leverage its intellectual capital in order to provide the highest quality service possible to its developer and investor clients. The real estate finance and investment management group which is responsible for market rate multifamily and commercial financings by the Company will be headed by Executive Vice President Charles M. Pinckney and will expand services provided to institutional investors through direct advisory agreements, MuniMae sponsored funds and other financing products.
>
> Executive Vice Presidents Jenny Netzer and Frank G. Creamer, Jr. will lead efforts to expand business opportunities and capital relationships. Ms. Netzer will focus on developing new tax credit and affordable housing finance products. Mr. Creamer will be responsible for broadening relationships with financial institutions and pension funds as well as providing support to the Company's strategic initiatives. As previously announced, Melanie M. Lundquist assumed the role of Executive Vice President and Chief

41

Financial Officer, effective January 1, 2006. Earl W. Cole, III, Executive Vice President, remains in charge of credit policy and Stephen A. Goldberg will continue as General Counsel, Taken together, the reorganization effort resulted in a reduction in the Company's workforce of approximately 8%.

75.    In the January 20, 2006 press release, defendant Falcone commented on the

reorganization as follows:

We constantly look for ways to improve our service to capital partners and developer clients. While efforts such as these are never easy, and good people were asked to leave the business, we have nonetheless now positioned ourselves to deliver services more efficiently and pursue new opportunities that will improve profitability and increase shareholder value for many years to come. Moreover, we were able to accomplish the reorganization while still exceeding our financial goals for 2005, and we have strong prospects for solid growth in 2006.

76.    On March 17, 2006, the Company filed for a 15-day extension of the deadline

for filing its Annual Report on Form 10-K for its fiscal year 2005 ("2005 Annual Report"). On

March 30, 2006, the Company announced yet another delay in the filing of its 2005 Annual

Report in a press release that stated, in relevant part:

MuniMae (NYSE:MMA) today announced additional information related to the completion of its financial statements and the filing of its Annual Report on Form 10-K for the year ended December 31, 2005. On March 10, 2006, the Company announced that it would restate net earnings for the nine month period ended September 30, 2005 as well as the fiscal years 2004, 2003 and 2002. On March 17, 2006, the Company filed for a 15-day extension of the deadline for filing its Annual Report on Form 10-K for the year ended December 31, 2005. Currently, the Company expects to host a conference call to discuss its financial results on or about April 7, 2006 and file its 2005 Form 10-K on or about April 14, 2006.

As previously announced, this restatement does not impact cash available for distribution (CAD) in any period. CAD is a supplemental non-GAAP performance measure reported by the Company in addition to net earnings. The Company currently expects that 2005 CAD financial results will exceed the current consensus among equity analysts covering the Company by approximately 2%.

77.     Despite the Company's failure to file its 2005 Annual Report, the Company

announced on April 11, 2006, the financial results for its fourth quarter and fiscal year 2005

ended December 31, 2005, in a press release that stated, in relevant part:

> MuniMae (NYSE: MMA) today announced unaudited financial
> results for the fourth quarter and full year 2005. Net earnings were
> $16.1 million ($.42 per diluted share) for the three months ended
> December 31, 2005, as compared to $17.1 million ($.48 per diluted
> share) for the fourth quarter of 2004, as restated. For the full year,
> net earnings were $85.8 million ($2,24 per diluted share) in 2005,
> as compared to $50.9 million ($1.46 per diluted share) in 2004, as
> restated. Cash available for distribution (CAD) was $29.8 million
> for the quarter and $95.7 million for the year ended December 31,
> 2005, an increase of 34% and 17%, respectively over the
> comparable amounts for 2004. On a per share basis, CAD was $.78
> for the three months ended December 31, 2005, an increase of 24%
> over the fourth quarter of 2004. For the full year, CAD per share
> was a record $2.51, an increase of 8% over 2004 results. A
> reconciliation of CAD to net earnings is included in the
> accompanying financial table. The financial results described above
> are subject to the completion of the audit by the Company's
> independent registered public accountants, and are therefore subject
> to change.
>
> 2005 Highlights
>
> -- Closed $77 million of acquisitions.
>
> -- Originated $3.8 billion of new investments, an increase of $1.2
> billion and 49% ahead of 2004 production.
>
> -- Increased tax credit equity syndications 15% to $1.3 billion
> making MuniMae the largest sponsor of tax credit equity
> investments in the United States.
>
> -- Generated $135 million of fee revenue (on a CAD basis), a 28%
> increase over 2004.
>
> -- Raised more than $250 million of capital through balanced issuances of common
> stock and preferred shares.
>
> In recognition of these outstanding achievements, the Company's
> Board of Directors approved the 36th consecutive increase in the
> quarterly distribution that was paid to shareholders on February 10,
> 2006. The distribution of $.4925 per share represents a 4% increase
> from the comparable distribution last year. On an annualized basis,
> the distribution equates to $1.97 per common share and represents
> a 7.5% yield based on the April 10, 2006 closing price of $26.35

per share. The stated yield does not give effect to any tax savings investors may realize from the portion of the distribution that is exempt from Federal income taxes.

78.    In the April 11, 2006 press release, defendant Falcone commented on the

Company's self-described "strong performance" as follows:

We accomplished a great deal in 2005. We closed the acquisitions of MONY Realty Capital and Glaser Financial which significantly expanded the mortgage banking products we offer as well as the services we can provide to institutional investors. In addition, we reorganized our operations to improve profitability and client service for many years to come. With greater diversity of revenue sources, a more efficient operating platform and a distribution that represents a lower percentage of CAD, MuniMae is well positioned for continued growth over the long-term.

79.    On April 12, 2006, the Company held a conference call for the public to discuss

the earnings announced April 12, 2006. On the conference call for the Company were defendants

Falcone, Lundquist, Cole, Mentesana, and Charlie Pinckney. During the conference call,

defendant Falcone commented on the Company's failure to timely file its 2005 Annual Report as

follows:

Not unexpectedly, the efforts necessary to restate our prior year financial statements have strained our resources in terms of the timely completion of 2005 statements. We are in the final stages of completing our I OK and our independent registered public accountants, Price Waterhouse Coopers, are finishing their audit procedures. Therefore, the financial results included in the press release are unaudited, and we expect to file an 8K next week when they are complete.

80.    Defendant Falcone further commented on the Company's 2005 business

successes as well as the previously announced reorganization as follows:

The past year, 2005, was filled with much accomplishment. Financial results were excellent. Net earnings were $2.24 per share, a 53% increase over the prior year amount as restated. Cash available for distribution was a record $2.51 per share and represents an increase of 8% over 2004.

We closed two acquisitions during the year, Money Realty Capital in February and [Glazier] Financial in July, and completed a strategic reorganization of the company's operations in late

44

December. As a result, we now offer more products and services to our clients, and these diversified offerings have begun to show in our production volume.

During 2005, production was $3.8 billion. An increase of $1.2 billion, or 49%, over 2004 levels. Tax credit equity raised during the year was a record $1.3 billion, a 15% increase over 2004, and we finished the year as the largest tax credit syndicator in the United States. We also closed approximately $1.7 billion of permanent loans and structured finance products as well.

Late in the year, we completed a strategic reorganization that simplifies our structure and positions us to better serve our project sponsors and capital partners while improving profitability. We now have two main operating companies, MMA Financial and MMA Realty Capital.

MMA Financial combines all the company's affordable housing operations, and MMA Realty Capital is responsible for market rate multifamily and commercial financings as well as other finance investment management services. We belief this new structure will drive shareholder value for many years to come.

81.     During the conference call, defendant Lundquist further iterated the "very strong" financial performance of the Company through 2005 and summarized the Company's financial results. Defendant Lundquist provided further details concerning the Company's previously announced restatement and the circumstances leading up to the restatement:

> I would like to take a few minutes to discuss the restatement of our previously consolidated financial statements. The restatement effects our GAAPs based financial statements only and did not have an impact on previously recorded CAD. The press release that was issued on March 10th as well as the 8K filed subsequently cover in detail the reasons for the restatement, so I won't go through all of that again. That said, I think it's important to note that these issues were discovered by the company in connection with our quarterly financial closing processes.
>
> Also, the most significant adjustment relates to the timing of recognition of syndication fees. As many of you know the company earns syndication fees when it originates a fund and when the fund purchases property interest. For funds we consolidated, these fees were deferred and recognized over the life of the funds, We revisited this deferral treatment, reviewed industry practices and concluded that these fees should not be deferred but recognized when the fund purchases the property interest. Going

forward, this change will result in a closer alignment of GAAP net earnings in CAD, which is a positive outcome.

Obviously, we need to address the implications to our internal controls resulting from these errors. We have concluded that we have material weaknesses in internal controls over financial reporting as of December 31, 2005 and 2004. We believe these weaknesses are attributable primarily to an insufficient number of experienced accounting staff.

In 2004, the company more than doubled the size of its accounting staff by year end, the majority of the new hires beginning during the second half of the year. This was also the first year in which an audit of internal controls was required by section 404 of the Sarbane's Oxley act; and the company implemented the consolidation effects of SID 46R. But needless to say, 2004 was a challenging year for the company's accounting group.

In 2005, we continued to strengthen our accounting department with the hiring of a Chief Accounting Officer, Controller and two Assistant Controllers, each who have more than 15 years of real estate accounting experience. We will continue to hire additional qualified staff, train our existing staff, and assess skill sets to assure they are appropriate to support our financial reporting requirements. We believe these measures are responsive to the issues and indicative of how seriously we take our responsibilities as a public company. I think that's more than enough from me. At this point, I'd like to turn the call over to Gary Mentesana.

82.    Defendant Mentesana commented on the Company's purported business

reputation and prospects for the Company's fiscal year 2006, as follows:

In addition to production volume, we have an outstanding reputation for innovative high quality service. We think that the demand for tax credit equity investments will continue to exceed supply, a trend that we're expecting will continue for much of the year. We'll continue to employ creative solutions to try to maintain our net fee percentage, and, of course, we will be very selective in determining which investments to pursue.

We intend to leverage the scale and reputation of our equity platform in growing the debt side of the affordable housing business. Our lending operations include proprietary programs such as direct investments for portfolio and various pension funds as well as Fanny Mae and Freddie Mac. We continue to offer acquisition loans construction and permanent loan products. While it's more difficult to quantify the size of the debt market, we

estimate that our share is less than 5%, so we're optimistic about our prospects for growth from this side of the platform.

Our 2006 production goal for MMA Financial calls for approximately 30% increase over 2005's level of 1.8 billion. At this point, we think the tax credit equity syndications will approximate that of 2005. So investments in rated and unrated tax-exempt bonds, as well as taxable debt products should drive the majority of the growth in 2006. That represents the brief summary of MMA Financial. I'll now turn the call over to Charlie Pinckney. Charlie?

83.  During the conference call, defendant Falcone commented as follows with regard to the impact of the Company's purportedly strong financial condition on its future prospects:

Thanks, Charlie. Looking to the future, we are optimistic about the prospects for our company. Continued change and dislocation within the real estate finance industry will yield opportunities to increase market share. Our position as a market leader and multifamily finance combined with our new structure will allow us to meet more of the product needs of our developer clients. Leveraging this strength we will provide more commercial finance offerings and other products and services.

There continues to be a tremendous amount of capital available for real estate investments, which is a mixed blessing. Cheap and abundant capital, which enables us to attractively finance our operations is clearly a positive, however too much capital has resulted in greater competition and pricing pressure. Even worse, some market risk deals today would have been categorized as high risk only a short time ago.

Going forward we will continue to focus on prudently managing risk as we have in the past. At this point we expect growth in 2006 CAD per share to be between 4 and 5% higher than the 2005 level of $2.51, which we think will be a remarkable achievement in this environment.

84.  Defendant Falcone further stated, in relevant part:

In thinking about our company over the long term I'm sure you're interested in the impacted asset sales going forward. We see our most important task as taking the steps necessary to position the company for sustainable growth over the long term. By actively

growing our fee based businesses as well as our taxable financing products we are taking a big step in that direction.

Selling certain assets is an important part of our strategy as well, aside from the obvious benefits of capital recycling, these transactions help us continue to grow our distributions to shareholders while maintaining an appropriate pay out ratio. Our view of sales is consistent with that of many REIT management teams who take advantage of similar opportunities.

These sales, which are hard to predict, impact shareholders' tax positions in 2 ways. First, the most profitable of these will generate capital gains. Conversely we are also looking to sell some weaker assets in order to recycle capital. While these sales could offset some capital gains, the extent we sell tax exempt bond assets, which we would expect to do we could temporarily and negatively impact our tax exempt percentage. At this time we are not in a position to quantify the potential impacts, if any, from such asset sales.

85.    Defendant Falcone ended his presentation with the following self-congratulatory comments regarding the past financial performance of the Company and the ability of the Company to grow in the future:

Since listing as a public company in August 1996, Munimae has grown from a small niche market investment to a diversified real estate finance company with significant scale. Assets under management in 1996 were approximately 300 million as compared to more that 16 billion managed today.

CAD has grown at a compound annual rate of 7% and the distribution to our shareholders has increased at a comp end annual rate of 4%. The result has been the creation of significant value.

A $10,000 investment at our listing with distributions reinvested was worth almost $37,000 in early February when we paid our last quarterly distribution. That represents an increase of almost 15% on a comp end annual basis. Over that same period the compound total returns for the S&P 500 and NASDAC were 9 and 8% respectively.

As we enter our 10th year as a public company we are well positioned to continue this impressive record. Greater diversity of the company's revenues will allow us to continue to generate solid growth in CAD over the long term. Also because we are paying our a lower percentage of CAD than ever before, our distribution is m ore secure today than in the past. So the prospect for continued growth are better.

Management and the board is committed to continuing to drive financial performance with the obvious goal of getting our share price growth to match that of our financial performance.

Significantly we have grown CAD approximately $0.60 per share and distributions $0.25 per share since 2002 that we start today with a similar share price to year-end 2002. At this point, we'll stop and take your questions, Operator?

86.    In response to the lack of questions, defendant Falcone commented:

Well my guess is that without the supplemental package it is difficult for folks to ask questions. We certainly appreciate that but did want to get the performance for 2005 out there and the expectations for 2006 out there for folks to understand. We certainly feel optimistic about 2006, and I suspect that folks will be in a position to want to ask questions when we release the supplemental package which we - and the 1 OK which we will - which we expect to be next week, middle to end of next week.

We will have our first quarter call in May, in the first week of May, so our expectations are we will not have any - a call when we release our 1 OK, but we'll be prepared to deal with those questions in the first week of May.

So thank you all very much. We appreciate your continued support for the company. And we look forward to continuing our strong performance through this year. Take care.

87.    On May 11, 2006, the Company filed a "Notification of inability to timely file Form

10-Q" with the SEC on Form NT 10-Q which stated, in relevant part:

As described in the current report on Form 8-K filed on March 16, 2006, the registrant will restate its financial statements covering the fiscal years ended December 31, 2004, 2003 and 2002, and the quarterly periods within those years, and the first three quarterly periods in the fiscal year ended December 31, 2005 (the "Affected Financial Statements") in the registrant's annual report on Form 10-K for the year ended December 31, 2005 (the "2005 Annual Report"). On March 17, 2006, the registrant filed a Notification of Late Filing of Form 12b-25 ("10-K Notice") indicating that it would be unable to file the 2005 Annual Report within the prescribed time period, and the registrant has been unable to file the 2005 Annual Report through the date hereof.

Since the date of the 10-K Notice, the registrant has continued its efforts to restate the Affected Financial Statements and file the 2005 Annual Report. As a result of the dedication of significant management resources to these efforts, the registrant will be unable to file its quarterly report on Form 10-Q for the quarter ended March

31, 2006 within the prescribed time period and is unable to reasonably estimate anticipated changes in results of operations from the corresponding period for the last fiscal year.

88.    Finally, on June 22, 2006, the Company issued its 2005 Annual Report. The 2005 Annual Report provides the following discussion of investments with unrealized losses:

Investments with Unrealized Losses

The following table shows unrealized losses and fair value aggregated by length of time that the tax-exempt bonds or interests in bond securitizations have been in a continuous loss position at December 31, 2005, 2004 and 2003.

December 31, 2005
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $211,625 | $(3,984) | $264,752 | $(56,115) | $476,377 | $(60,099) |

December 31, 2004
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $210,880 | $(12,862) | $293,147 | $(45,547) | $504,027 | $(58,409) |

December 31, 2003
(in thousands)

| Less Than 12 Months | | 12 Months or More | | Total | |
|---|---|---|---|---|---|
| Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| $206,947 | $(13,820) | $203,352 | $(39,757) | $410,299 | $(53,577) |

89.    On August 1, 2006, the Company filed its 1st Quarter 2006 report. It has not filed a quarterly or annual report since this filing.

90.    On September 14, 2006, the Company announced that it had concluded, based upon the recommendation of the Company's management, that certain previously filed financial statements covering the fiscal years ended December 31, 2005, 2004 and 2003, and

the quarterly periods within those years, and the first quarterly period in the fiscal year ended December 31, 2006, should be restated.

91.    On October 26, 2006, the Company announced that PricewaterhouseCoopers LLP ("PwC") was dismissed as its independent registered public accounting firm, effective immediately.

92.    On February 9, 2007, the Company stated that it knows of no reason why recent trading in the stock has resulted in a decrease in price. The Company was responding to an almost 15% drop in share price. MuniMae management noted that it is not engaged in sub-prime or any other single family mortgage lending activities, and that its outlook for the multifamily rental sector is positive. The press release stated:

> Management of the Company knows of no reason why the recent trading of the stock has resulted in a decrease in price. Management of the Company is aware of recent developments in the sub-prime mortgage lending markets; however, to clarify, the Company is not engaged in sub-prime or any other single family mortgage lending activities. In fact, the debt and equity financings arranged by the Company in the housing sector are for multi-family rental properties. The Company's outlook for the multi-family rental sector is positive.

92.    On May 4, 2007, the Company issued a press release entitled "MuniMae Announces 41st Consecutive Increase in Quarterly Distribution" which provided, in relevant part:

> Municipal Mortgage & Equity, LLC ("MuniMae" or "the Company," NYSE:MMA) announced that yesterday its Board of Directors declared a distribution of $0.5175 per common share payable on May 23, 2007 to shareholders of record as of May 10, 2007. This represents a 4% increase over the distribution for the comparable period last year. On an annualized basis, the distribution equates to $2.07 per common share and represents a 7.5% yield based on the May 3, 2007 closing price of $27.56 per share. Although a portion of the income allocated to shareholders may qualify for exemption from Federal income taxes, the stated yield does not reflect potentially higher net returns investors may realize compared with other investments. The Company also

confirmed that assuming it is able to execute its capital plan and the business performs in accordance with management's plans, the Company will continue with its quarterly distribution policy. In July or August 2007, the Company intends to provide a mid-year review of its investment originations as compared to the first half of 2006. Michael L. Falcone, Chief Executive Officer stated, "Our business is performing well. MMA Financial continues to be widely recognized as a leader in affordable housing finance, and we are encouraged by the prospects from MMA Realty Capital, and longer-term, our new business initiatives. We are pleased to be able to increase our cash distribution to shareholders and are very proud of our more than 10 year history of consistent growth in quarterly cash distributions."

The Company also announced updated information on its ongoing efforts to complete the restatement of its previously filed consolidated financial statements as well as its 2006 consolidated financial statements. The Company has prioritized its restatement efforts by initially focusing its efforts on completing the audited financial statements of two key subsidiaries, MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub") and MMA Mortgage Investment Corporation ("MMIC"). Completing these subsidiary level financial statements facilitates the Company's access to sources of capital and its ability to continue to originate mortgage loans that are ultimately sold to government-sponsored enterprises, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Company currently expects that the audited financial statements of TE Bond Sub and MMIC will be completed during the second quarter of 2007.

As a result of prioritizing the completion of these subsidiary level audited financial statements, the need to consolidate the majority of the low income housing tax credit equity funds in which it holds interests, and its ongoing restatement efforts, the Company currently expects to file its 2006 annual report on Form 10-K on or before November 30, 2007. As the Company's restatement effort has progressed, additional material weaknesses in its controls over financial reporting have been identified. Consistent with previously identified matters, the Company is developing and implementing remediation plans to address these weaknesses. The Company has met with all its lenders to update them on its progress and current expectations. Further, the Company has obtained waivers from all its lenders which provide for an extension for submitting the 2006 Form 10-K by November 30, 2007, and it is currently in compliance with all of its debt covenants.

Since the Company did not file its 2006 annual report on Form 10-K in a timely fashion, the Company was notified by the New York Stock Exchange ("NYSE") that the NYSE would monitor the Company's filing status for a period of six months from the due date of the 10-K. For companies that are unable to file their annual reports within six months from the required due date, the NYSE may, in its sole discretion, allow the company's securities to trade for up to an additional six month period. Management of the Company met with representatives of the NYSE to provide an update on the progress of its restatement efforts and current expectations for completion. The Company informed the NYSE that it expects to formally request an extension from the NYSE to continue listing its common shares beyond September 1, 2007 once the six month period commencing on the due date for the annual report has elapsed, however, there can be no assurances that such extension will be granted. Management plans to update its lenders and the NYSE on a regular basis as it makes progress in its restatement efforts. The Company continues to cooperate fully with the Securities and Exchange Commission in connection with its non-public, informal inquiry.

93.     On July 10, 2007, the Company issued a press release entitled "MuniMae

Announces Organizational Changes" which stated, in relevant part:

Municipal Mortgage & Equity, LLC ("MuniMae" or the "Company," NYSE:MMA) today announced that Charles M. Pinckney has been named Chief Operating Officer and that it has accepted the resignation of Melanie M. Lundquist, the Company's Chief Financial Officer. Mr. Pinckney will also serve as interim Chief Financial Officer while the Company searches for a replacement for Ms. Lundquist. The Company today also announced the completion of the audited financial statements for MuniMac TE Bond Subsidiary, LLC ("TE Bond Sub"), the subsidiary that holds the majority of the Company's tax-exempt bond investments.

The Company today also announced that it has engaged Navigant Consulting, Inc. to support Mr. Pinckney's efforts to complete the Company's restatement efforts. Mr. Falcone added, "The Company is fortunate to have engaged the services of the Navigant team. Their track record with complex accounting and restatement issues is an invaluable asset and, coupled with Charlie's skilled leadership and operational expertise, we believe that we have the pieces in place to complete our efforts and emerge a stronger enterprise."

As previously disclosed, the Company has focused its efforts on completing the audited financial statements of TE Bond Sub and

another of its subsidiaries, MMA Mortgage Investment Corporation ("MMIC"), as it simultaneously continues its efforts to complete the restatement of its financial statements and finalize its 2006 annual report. Mr. Falcone stated, "Completing the TE Bond Sub audit is a very important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report. As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37,5 million previously reported."

These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds (which increased shareholders' equity in TE Bond Sub by approximately $66.9 million as of December 31, 2005) and the Company's assessment of bond impairments (which decreased shareholders' equity in TE Bond Sub by approximately $14.1 million as of December 31, 2005), for the net increase of $52.9 million mentioned above, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements.

Certain other subsidiary level audited financial statements, specifically some of those for funds the Company manages on behalf of others, have also been completed and provided to the appropriate investors.

The Company is continuing to work towards completing the audited financial statements of MMIC and has obtained extensions through August 31, 2007 from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), each of which require audited MMIC financial statements. In addition, the Company has obtained waivers through August 31, 2007 from those of its lenders that require delivery of audited fmancial statements for MMIC, and it is currently in compliance with all of its debt covenants.

The Company reiterated its intent to provide a mid-year review of the Company's performance in late July or August. At that time, the Company also expects to provide more information on the timing of the completion of MMIC's financial statements.

The Company today also announced information about material weaknesses in its internal controls over financial reporting that were identified by management during the preparation of the

> financial statements of TE Bond Sub and MMIC. Details about
> these material weaknesses, and others that have been identified as
> the Company's restatement efforts have progressed, are included in
> a Current Report on Form 8-K filed by the Company today.

94.    On September 4, 2007, the Company stated that it had received a six month extension by the NYSE of the time, through March 3, 2008, in which to complete and file our 2006 10-K, subject to reassessment by the NYSE on an ongoing basis. The Company stated that it expected to file its 2006 10-K prior to the extension date.

95.    During October and November 2007, the Company disclosed that that it had entered into agreements with several of its lenders to extend the deadline for delivery of audited financial statements for the Company to February 15, 2008.

96.    On December 13, 2007, the Company stated that it had been asked by its shareholders to comment on the recent market activity of the Company's stock. The press release stated: "Management of the Company stated that it was not aware of any pending transaction or event that might give rise to the recent volatility in the Company's stock price. In addition, management reiterated that the Company was not engaged in sub-prime or any other single family mortgage lending activities."

97.    On January 28, 2008, the Company issued a press release announcing its quarterly dividend. Therein, the Company disclosed, yet again, that it would be extending the time in which it believed it would file its restated financial. However, as a result of missing the previously announced March 3, 2008 deadline, the Company would not meet the necessary deadlines to file current financial reports necessary to maintain listing status on the NYSE. As a result, it would be delisted and trade on the over-the-counter market. It further disclosed that it was slashing its dividend from $0.33 per share to $0.525, and would be filing an 8-K with the SEC disclosing further changes in its accounting policies. The press release provides, in relevant part:

> Municipal Mortgage & Equity, LLC ( MuniMae or the Company,
> NYSE: MMA) announced today that its Board of Directors has

declared a dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008. The Company also announced that while it expects to have completed by the end of February, its substantive work required to prepare its 2006 financial statements and its restated audited financial statements for 2005 and 2004, the Company does not expect to be able to file its audited financial statements by its previously announced goal of March 3, 2008. Based on work done to date, the Company does not believe the results of the restatement will materially change the previously recorded cash balances of the Company and its subsidiaries.

The reduction in the dividend distribution from $0.5250 to $0.33 per share is due to the cost of the Company's ongoing restatement of its financial statements, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business, an increasingly important part of the Company's business. A portion of this dividend will be paid from sources other than cash generated from operations. The Board of Directors will continue to review the Company's dividend payout on a quarterly basis based, among other factors, on the Company's net cash generation and the strategic needs of the business.

"Knowing the importance of the dividend to our shareholders, it was a difficult decision to reduce the dividend," stated Michael L. Falcone, Chief Executive Officer. "However, we believe that in this market it is important to be cautious in our approach to finding the balance between retaining capital to grow and to protect against uncertainty on the one hand, and distributing capital to shareholders as a dividend on the other. For 2007, our production numbers were solid, especially in our MMA Renewable Ventures unit which finished the year with a strong pipeline of additional solar and other renewable and clean energy opportunities. We believe the diversity of our various businesses helps us to succeed even in a tough marketplace. In these uncertain times, we will continue to be prudent in our management of the business, while remaining watchful for the opportunities that such markets usually present. We hope in the future to grow the dividend as we complete our restatement and as market conditions allow."

Update on Restatement

The Company also announced that it is filing with the Securities and Exchange Commission ("SEC") a Form 8-K, available at www.sec.gov, which discusses the nature of the changes in the Company's accounting policies that are being made as a result of

the Company's ongoing restatement efforts covering its 2006 results. The overall impact of the restatement and the changes in the Company's accounting policies are still being quantified; however, the Company believes that the final result of the restatement will not materially change the previously recorded corporate cash balances of the Company and its subsidiaries. However, work on the restatement and the 2006 financial statements has not been completed and further work on the restatement or the audit of the 2006 financial statements could change these results.

The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and commence delisting procedures. Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting. If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

The Company currently expects to complete its unaudited financial statements for 2006 and its unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008, and to file its Annual Report on Form 10-K for the year ended December 31, 2006, by May 30, 2008. The delay in completing the restatement and filing the Form 10-K is not expected to have any impact on the issuance of K- l's to shareholders in time for inclusion in their 2007 tax returns.

Michael Falcone concluded, "Thanks to the hard work of our employees and outside consultants and the support of the Board, we are making substantial progress on our restatement efforts and are able to report to the marketplace this preliminary information. Accounting for our business is complex; this combined with our previously announced change in auditors, necessitated a top-to-bottom review to ensure that our financial information is completely accurate. Going forward we are dedicated to making sure that we have the policies, systems and people in place to meet our reporting obligations."

98.    On January 29, 2008, before the open of trading, the Company filed a Current

Report on 8-K detailing additional "changes" to its accounting policies. The January 29, 2008

8-K stated, in relevant part:

> The press release discusses the pending restatement of our audited financial statements for the year ended December 31, 2005 and 2004. That restatement has not been completed; however, we expect that the restatement will reflect the following changes to our accounting policies:
>
> • Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests, The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest. The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.
>
> • Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds. In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds.
>
> • Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.
>
> • Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.
>
> • Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.
>
> • Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations,

including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

• Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

Because neither the restatement nor the audit of our restated financial statements has been completed, it is possible that there will be additional changes as a result of the restatement. The changes as a result of the restatement will affect our financial statements for the year ended December 31, 2006 and subsequent years, as well as the financial statements that are being restated.

99.    The news shocked the market.  As a result of the January 28th and 29th announcements, the price of the Company's common stock opened up for trading at $12.33 per share but immediately fell to below $10.50 per share, and closed for trading on January 29, 2008 at $9.19 per share, down $8.01 per share from the previous days close of $17.20, or 46%.

100.    Prior to the January 29th trading day, as a result of the cumulative selective disclosures of the Company's ongoing fraud, themselves often incomplete, misleading, and incoherent, the price of the Company's common stock had dropped from a high of $32.20 per share on December 29, 2006 to a low of $13.25 per share on December 12, 2007.

101.    The statements previously made by Company officers were each materially false and misleading because they failed to disclose and misrepresented the true financial condition and operations of the Company. The following adverse facts which were known to Defendants or recklessly disregarded by them are: (1) that the Company has maintained artificially inflated asset values on a significant portion of its tax-exempt bond portfolio and has not properly

recognized other-than-temporary impairments in its loan portfolio; and (2) that the Company has failed to maintain adequate internal accounting controls and procedures, and has, in fact, overridden controls and procedures.

102.    Consistent with the Company's purported successes, and despite the size of the Company's assets, from the Company's fiscal year 1998 through year-end 2005, the Company took total impairment and valuation allowances related to investments of merely $27.337 million.

103.    In direct contravention of the Company's own policy regarding other-than-temporary impairments and the valuation of its tax-exempt bond assets, as well as guidance provided by FAS 115, the SEC, the Company disregarded impairment indicators on a substantial portion of its non-performing assets and continued to account for them as though they were either not non-performing or were merely subject to treatment as temporary impairments and accounted for as unrealized losses. In so doing, the Company trumpeted its ability and intent to hold its non-performing assets until recovery, ignoring its own actions and statements which effectively caused the Company to relinquish such ability and intent.

104.    In fact, despite having information concerning the true value of its tax-exempt debt that required the Company to take substantial impairments pursuant to its own policy and GAAP the Company continued to issue positive statements concerning its financial performance and prospects, and continued to misrepresent the true value of its assets.

105.    Throughout the Class Period, the Company disclosed to investors the face value of non-performing bonds, unrealized losses on non-performing bonds and impairments the Company had recorded against non-performing bonds. In connection with the non-performing assets, the Company also disclosed transactions it entered into in connection with certain non-

performing assets that the Company disposed. The Company's exposure to non-performing assets and its success in handling non-performing assets in a favorable manner was critical to investors' consideration of the Company's future prospects and in measuring the risks to the Company through its exposure to non-performing assets.

## ADDITIONAL SCIENTER ALLEGATIONS

106.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; know that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding MMA, their control over, and/or receipt and/or modification of MMA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MMA, participated in the fraudulent scheme alleged herein.

107.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

108.     Additionally, the defendants were able to complete, using the false and misleading information, frequent issuances of additional equity.

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

109.    At all relevant times, the market for MMA's common stock was an efficient

market for the following reasons, among others:

> (a)    MMA's stock met the requirements for listing, and was listed and
> actively traded on the NYSE, a highly efficient and automated market;
>
> (b)    As a regulated issuer, MMA filed periodic public reports with the SEC
> and the NYSE;
>
> (c)    MMA regularly communicated with public investors via established
> market communication mechanisms, including through regular disseminations
> of press releases on the national circuits of major newswire services and through
> other wide-ranging public disclosures, such as communications with the
> financial press and other similar reporting services; and
>
> (d)    MMA was followed by several securities analysts employed by major
> brokerage firms who wrote reports which were distributed to the sales force and
> certain customers of their respective brokerage firms. Each of these reports was
> publicly available and entered the public marketplace.

110.    As a result of the foregoing, the market for MMA's common stock promptly

digested current information regarding MMA from all publicly available sources and reflected

such information in MMA's stock price. Under these circumstances, all purchasers of MMA's

common stock during the Class Period suffered similar injury through their purchase of

MMA's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

111.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were

no meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MMA who knew that those statements were false when made,

### FIRST CLAIM

**Violation Of Section 10(b) Of The Exchange Act Against And Rule 106-5
Promulgated Thereunder Against All Defendants**

112.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause plaintiff and other members of the Class to purchase MMA's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

114.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for MMA's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

115.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MMA as specified herein.

116.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MIA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MMA and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MIA's common stock during the Class Period.

117.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

118.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

64

defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MMA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

119.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MMA's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of MMA's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired MMA common stock during the Class Period at artificially high prices and were or will be damaged thereby.

120.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding MMA's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their MMA common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

121.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 1 Ob-5 promulgated thereunder.

65

122.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of The Exchange Act Against the Individual Defendants

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. The Individual Defendants acted as controlling persons of MMA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

125.    As set forth above, MMA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of

66

their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

## JURY TRIAL DEMANDED

Plaintiff herby demands a trial by jury.

Dated: February 8, 2008

Respectfully submitted,

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: _____

Arthur N. Abbey
Nancy Kaboolian (NK 6346)
nkaboolian@abbeyspanier.com
212 East 39th Street
New York, New York 10016
Tel: (212) 889-3700
Fax: (212) 684-5191

Attorneys for Plaintiff